Argued and submitted March 12, affirmed in part, reversed and remanded in part November 21, 1984

In the Matter of the Compensation of
LaJuan D. Allen, Claimant.

ALLEN,
*Petitioner,*

*v.*

FIREMAN'S FUND INSURANCE COMPANY,
*Respondent.*

(82-02652; CA A29993)

691 P2d 137

Robert H. Grant, Medford, argued the cause for petitioner. With him on the brief was Grant, Ferguson, Carter, P. C., Medford.

H. Scott Plouse, Medford, argued the cause for respondent. With him on the brief was Cowling & Heysell, Medford.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

In this workers' compensation case, petitioner[1] appeals an order of the Workers' Compensation Board awarding a total of 90 percent permanent partial disability, awarding a penalty and attorney fees because of the unpaid portion of a 1977 permanent partial disability award, but failing to award fees and a penalty with respect to the unpaid portion of a 1975 award. We reverse the disability award and the failure to award the penalty and fees related to the 1975 award and affirm the award of penalties and fees related to the 1977 award.

With respect to disability, the issue is extent only. Petitioner contends that the claimant should have been found permanently and totally disabled. He was a 51-year-old man who had worked at various jobs, including pulling the green chain and as a mill worker, sewer contractor and rancher. He had a long history of low back and psychological problems. He first injured his back in 1968 in California, after which he had surgery. In March, 1974, after moving to Oregon, he compensably injured his back while doing steel fabrication work. Shortly thereafter he had spinal fusion surgery. In June, 1975, a determination order awarded 25 percent unscheduled permanent partial disability. That August he was hospitalized for further surgery, a laminectomy. During the operation, he began hemorrhaging and the surgery could not be completed. While recuperating in the hospital, he had a psychotic episode in which he began hallucinating and having delusions and became very difficult to control. He was placed under the care of a psychiatrist Dr. Luther, and was transferred to a psychiatric unit. He improved under a course of medication.

Eventually Dr. Luther released him for surgery and in December, 1975, the surgical repair was accomplished. In December, 1976, the claim closure report of the surgeon, Dr. Weinman, noted that the claimant had a "moderately severe loss of function to the injured part and would be limited to sedentary work and to a job which would allow him to stand or sit at will." In February, 1977, he was awarded an additional 10 percent unscheduled permanent partial disability for his low back, for a total of 35 percent.

---

[1]The claimant's widow is now the petitioner in this appeal.

At that time Dr. Luther reported that he was seeing the claimant again and that he was not responding to treatment as well as he had previously. He described him as severely disturbed and said his condition included "some elements of what looks like organic loss, including memory deficit and confusion, and which also includes some paranoid and other ideation." He did not think claimant well enough to participate in vocational rehabilitation. In January, 1978, he reported that the claimant was having periods of improvement and some worsening and that he was on a course of stelazine and sinequan.

A psychiatrist, Dr. Quan, evaluated the claimant in June, 1978. He diagnosed "[d]epressive neurosis, chronic, mild to moderate." The doctor believed that the claimant could not benefit from a retraining program and that the duration of his condition did not indicate a good prognosis.

In 1979, Dr. Luther concluded that the claimant was ready to participate in a rehabilitation program at the Callahan Center, where he was enrolled in a four and one-half week program. He made progress and his outlook improved; however, it was noted at discharge that he was more depressed than usual. Later that year he enrolled in a vocational rehabilitation program, but it was terminated after his counselor noted his depression and Dr. Luther reported that the claimant would not be able to return to full time work. He was eventually referred to a private rehabilitation program, through which he and his wife completed motel management school, a plan Dr. Luther encouraged. The rehabilitation reports indicate that the claimant was motivated during training. He and his wife applied for jobs at various motel chains in the western United States, but were not successful in finding an appropriate position.

Dr. Luther stressed to the vocational rehabilitation counselor:

"As you know, Mr. Allen continues to show symptomatology of his depression, and it is my view that the hope of running a motel is very dependent on having Mr. and Mrs. Allen functioning as a team in that his day-to-day functioning is not real consistent, and at times Mrs. Allen will have to fill in for her husband.

"* * * At times Mr. Allen's ability to use good judgment in decisions is somewhat compromised by his depression."

Dr. Luther rated his psychological impairment for the insurer in August, 1981:

"* * * His psychotic depression is somewhat improved from two years ago, but he continues to be very subject to stress and continues to be very dependent on his wife.

"* * * * *

"Using the AMA guides to disability, I would say that Mr. Allen fits somewhere into the Class II Impairment of the Whole Man, somewhere in the order of 30-40 percent as his depression has lasted many years and has created a loss of interest in his activities, psychomotor retardation, but he is able to take care of personal hygiene and other self-care activities."

In January, 1982, Southern Oregon Medical Consultants evaluated his physical status and reported:

"It is very doubtful that this individual will return to regular work. We recommend that he continue with psychiatric care. With regard to his ability to stand, walk, sit and drive an auto, in an eight hour day the patient could do a cumulative of two hours of each of the four categories. * * *"

A March 16, 1982, Determination Order granted an additional 20 percent unscheduled disability award, for a total award of 55 percent. He appealed, and the referee and the Board both awarded a total of 90 percent permanent partial disability. Petitioner appeals, contending that the claimant was permanently and totally disabled.

It is clear that, although the claimant's physical condition limited him to some extent, it permitted him to do light work. At issue primarily is his mental disability. Dr. Luther's diagnosis was that the post-operative psychosis had developed into a psychotic depression. At the hearing, Dr. Luther stated that the claimant's psychotic depression was essentially permanent, his only hope for improvement being in the development of a new antidepressant or anti-psychotic drug. He explained that the reason he had not considered claimant 100 percent disabled was that he could drive a car and carry on some day to day activities. However, he said that the claimant's condition affected his judgment and energy and

concentration levels so that he was capable only of intermittent work. He stated:

> "* * * I have encouraged Mr. Allen with the cooperation of his wife to seek some type employment. The most reasonable thing that has been pursued and with some degree of success, although no ultimate success in terms of finding a job, has been something like motel management or something where Mrs. Allen can contribute a great deal to a joint endeavor. Mr Allen is capable in my judgment of intermittent work in the sense that some days he is reasonably good and some days he is—it would be virtually impossible for him to do other than very minimal simple tasks. And the problem of course, is that often this is unpredictable. My hope has been, and I think continues to be, that some kind of joint work would be possible. If Mr. Allen were, say to be divorced or would be—to be basically on his own, I am doubtful that there is any reasonably, to be reasonably expected type of job that he could hold down. In other words if he were in a sheltered situation, working for a close friend or something where he could work intermittently—do something, certainly there are some things he can do intermittently, if he were basically on his own I can't think of any 40 hour a week job that he could reasonably be expected to hold down."

The referee gave little weight to Dr. Luther's opinions, stressing that the claimant had been observed to tolerate four hours of sustained activity while at the Callahan Center and had successfully completed motel management training. The Board disagreed with the referee's assessment of Dr. Luther's testimony, but agreed with the award because it concluded that his conclusions did not support an award of permanent total disability. The Board stated that the claimant was not permanently and totally disabled, because Dr. Luther considered him able to work in a sheltered situation, such as motel management, in conjunction with his wife.

We agree with the Board's assessment of Dr. Luther's opinions. They are uncontroverted and consistent with the other reports, including those from the Callahan Center. The sustained activity noted while the claimant was at the Callahan Center does not contradict Dr. Luther's conclusion that his condition rendered him able to work only intermittently and unpredictably and prevents him from holding down a regular job.

■ We conclude that the record supports an award of permanent total disability. The question is whether his condition precluded him from "regularly performing work at a gainful and suitable occupation." ORS 656.206(1)(a). The standard has been expressed as "whether the claimant is currently employable or able to sell his services on a regular basis in a hypothetically normal labor market." *See, e.g., Harris v. SAIF,* 292 Or 683, 695, 642 P2d 1147 (1982). We conclude that his condition prevented him from meeting that test. In *Harris,* the claimant was found permanently and totally disabled, although he was earning money through investment and real estate transactions. The Supreme Court stated, in part:

> "The fact that a claimant may have an income even a substantial one, or that he or she is able to perform a variety of activities does not mean *ipso facto* that he or she is no longer permanently totally disabled. * * *
>
> "* * * A severely disabled worker who through luck or pluck is able to generate an income cannot be denied permanent total disability status simply because he or she has demonstrated an ability to 'earn money.' * * *" 292 Or at 695-96. (Footnote omitted.)

The court quoted a discussion of the "odd-lot" doctrine from 2 Larson, Workmen's Compensation Law, 10-164.21 to 10-164.49, § 57.51:

> " 'Total disability' in compensation law is not to be interpreted literally as utter and abject helplessness. Evidence that claimant has been able to earn occasional wages or perform certain kinds of gainful work does not necessarily rule out a finding of total disabilty nor require that it be reduced to partial. * * *
>
> "* * * * *
>
> "The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps."

*See also Hill v. U.S. Plywood-Champion,* 12 Or App 1, 503 P2d 728 (1972), *rev den* (1973).

■ The claimant's potential for work in collaboration

with his wife, who would fill in for him on bad days and make up for the shortcomings caused by his condition, falls into the category of "distortions" discussed above. The test is not whether the claimant and his wife were employable, but whether the claimant was. He could not be considered employable just because his wife could do part of his job. Her capabilities were not an extension of his. If the claimant had been able to work for an employer who was willing to call another employe to fill in whenever the claimant was not functioning, we would not thereby be prevented from considering him permanently totally disabled. The situation is not different because the other employe was the claimant's wife.

■ Petitioner also contends that the claimant should have been awarded penalties and attorney fees for the carrier's failure to pay part of his 1975 permanent partial disability award. ORS 656.262 provides for assessment of attorney fees and penalties against a carrier for unreasonable refusal to pay compensation, and ORS 656.382 requires a carrier to pay attorney fees if it "unreasonably resists the payment of compensation." The claimant received a permanent partial disability award of 25 percent on June 17, 1975. Shortly thereafter, the claim was reopened and the claimant began receiving temporary total disability payments. During that time, the carrier followed what it contends was then standard practice, suspending payment on the permanent partial disability award pending closure of the reopened claim. Another determination order issued February 8, 1977, awarding an additional 10 percent permanent partial disability. The claim was again reopened shortly thereafter, and the carrier again paid time loss benefits but suspended payments on the permanent partial disability award pending closure. The carrier states that permanent partial disability award payments were resumed after the claim was closed in March, 1982. The referee ordered the carrier to pay a 10 percent penalty and attorney fees on the unpaid portion of the 1977 permanent partial disability award, and the Board affirmed. Petitioner asks that that part of the award be affirmed but contends that, in addition, there should be a penalty and attorney fees for failure to make payments on the 1975 award.

In *Taylor v. SAIF,* 40 Or App 437, 595 P2d 515, *rev den* 287 Or 477 (1979), we held that a carrier ordered to pay compensation for temporary total disability following an

aggravation claim may not redesignate paid permanent partial disability installments as temporary total disability. We awarded penalties and attorney fees pursuant to ORS 656.262 and 656.382, stating:

"Compensation for permanent partial disability and temporary total disablity serve different purposes. * * *

"Because each form of compensation has a different statutory origin and a different purpose, we see no reason why the payment of one should excuse or defer the payment of the other. Payment of one is not a setoff for the other, ORS 656.216(2). No statute prohibits receipt of temporary total and permanent partial disability payments during the same period of time. No statute suggests that an aggravation claim automatically voids a previous determination order as premature. No statute authorizes a carrier to set off one type of compensation against the other, as SAIF did here. Because temporary total disability must be paid, because permanent disability must be paid sooner or later, and because the two types of compensation serve different purposes, there is nothing inequitable in requiring a carrier to make both types of payments concurrently." 40 Or App at 440-41. (Footnote omitted.)

The same logic applies here. The carrier contends that its failure to pay was not unreasonable, because such suspensions were standard practice until our 1979 decision in *Taylor v. SAIF, supra.* Such an argument was unsuccessful in *Taylor,* however, and must also be unsuccessful here. *But see Zwahlen v. Crown Zellerbach,* 67 Or App 3, 676 P2d 369, *rev den* 297 Or 228 (1984). The Board erred in failing to award a penalty and attorney fees for unreasonable refusal to continue payments on the 1975 permanent partial disability award.

We affirm the award of a penalty and attorney fees related to suspension of payments on the 1977 award, reverse the award of 90 percent permanent partial disability and remand with instructions to award permanent total disability and to calculate penalties and reasonable attorney fees for suspension of payments on the 1975 award.